# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| Flora SETAYESH, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Case No. 3:18-cv-00335 |
| ) | Judge Aleta A. Trauger |
| STATE OF TENNESSEE; ) | |
| TENNESSEE BOARD OF REGENTS; ) | |
| NASHVILLE STATE COMMUNITY ) | |
| COLLEGE; ) | |
| FLORA TYDINGS, individually and in her ) | |
| official capacity as Chancellor of the ) | |
| Tennessee Board of Regents; ) | |
| and KIM MCCORMICK, individually and in ) | |
| her official capacity as Interim President for ) | |
| Nashville State Community College, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 9), filed by the State of Tennessee, the Tennessee Board of Regents ("TBR"), Nashville State Community College ("NSCC"), Flora Tydings, individually and in her capacity as Chancellor of TBR, and Kim McCormick, individually and in her official capacity as Interim President of NSCC. The plaintiff, Flora Setayesh, has filed a Response (Docket No. 13), to which the defendants have filed a Reply (Docket No. 16). For the reasons discussed herein, the motion will be granted in part.

## BACKGROUND[1]

Setayesh has been employed by NSCC since 2001 and currently holds the position of tenured professor in the Chemistry Department. In July 2014, Setayesh was appointed Interim

---

[1] The facts are viewed in the light most favorable to the plaintiff.

1

Associate Vice President for Academic Affairs/Executive Assistant to the President. Prior to the appointment, Setayesh worked as a tenured professor. The transition from a faculty position to an administrative position changed Setayesh's contractual status from an academic year contract to a fiscal year contract. Setayesh's annual salary in this position was $93,481.50. In June 2015, Setayesh was promoted to Vice President of Institutional Effectiveness within the Office of Effectiveness and Strategic Initiatives. Her appointment was temporary, with initial terms of one year and continuing year-to-year until Setayesh opted to return to a faculty position. As set forth in the employment agreement memorializing her promotion ("Agreement"), Setayesh's initial annual salary as Vice President for Institutional Effectiveness was $115,000. Her salary eventually rose to $131,152.70. Prior to her appointment as Interim Associate Vice President for Academic Affairs, she had a discussion with NSCC President Dr. Van Allen regarding two TBR policies. The first, General Personnel Policy IV.J.1, indicates that conversions from fiscal year contracts to academic year contracts will occur at no less than 80% of fiscal year salary ("the 80% rule"). The second, Tenure in Non-Faculty Policy III.C.2, states that, upon transfer or reassignment, an employee's salary shall be made consistent with the provisions of any contract of employment. Setayesh accepted her appointment to an administrative position with the understanding that these policies would apply to her. The policies were incorporated into the Agreement and she was informed that they were binding. The Agreement also contained a special condition expressly stating that "both parties acknowledge that TBR policy governing tenure and salary conversion supersedes all language associated by this contract," which was explained to Setayesh to mean that she would be transferred back to a faculty position at an 80% salary conversion rate, should she so desire.

Setayesh states in her Amended Complaint that her "duties as Vice President of Institutional Effectiveness mainly included: (i) overseeing human resources, creative services, and institutional research; and (ii) monitoring resource allocations." (Docket No. 7 at 4.) She further states that, during her time as an administrator, she "was a vocal proponent within the Office of Effectiveness and Strategic Initiatives and the broader College on issues relating to the proper functioning of the College." (*Id*. at 5.) To that end, she voiced multiple "concerns outside of her official job duties about policies or practices," including:

    (a) the lack of oversight in academic affairs which became a major cause for concern during the tenure of Ron Davis, the Vice President of Academic Affairs;

    (b) the discovery that the schedule of courses was inconsistent and contained numerous errors, which cost the college thousands of dollars, denied many students access to courses, and threatened the academic integrity of Nashville State, its SACS accreditation, and its approval to offer [f]ederal financial aid. The net result of the changes to address Plaintiff's concerns was that some faculty had to work a higher number of requisite hours;

    (c) the discovery that two faculty members' courses contained copyright violations resulting in the removal of those faculty members' courses from the schedule;

    (d) the discovery that at least one course, that had more than twenty students, was cancelled so as not to inconvenience a full-time faculty member;

    (e) the discovery that the college had engaged in the practice of adding unnecessary sections in order to provide some faculty with preferred schedules, which cost the College more money to fund salaries;

    (f) the discovery that a faculty member had cancelled seven classes without making up those classes or notifying her supervisor of the cancellation of those [classes], prompting the resignation of said faculty member;

(g) the discovery that certain faculty had agreed to overload contracts which necessitated that the faculty increase their office hours but yet the faculty had not increased their office hours;

(h) the discovery that the campus notification system and process were weak, a violation of the Clery Act requiring schools to have timely warning when there are known risks to public safety on campus;

(i) the discovery that the Vice President of Finance and Administrative Services allowed an employee to attend classes during work hours, a policy violation;

(j) the discovery that Nashville State was offering certain online courses even though those courses had not been reviewed by the online committee to test the sufficiency of content, some courses being outdated and containing copyright violations;

(k) the discovery that TBR did not follow [its] own membership policy/template for the Nashville State Presidential Search Committee in October, 2017;

(l) the discovery that some deans asked nonexempt staff to teach in the classroom at night or during working hours, a violation of the Fair Labor Standards Act;

(m) the discovery that the College was using a "bridge contract" in order to avoid a break in service which was reported to the President of Nashville State and was referred to internal auditing for investigation; and

(n) the discovery of other miscellaneous practices that resulted in inefficient utilization of resources and violated applicable policies and procedures.

(*Id*. at 5–6.)

Setayesh alleges that her "reporting of her concerns" engendered hostility and harassment from NSCC faculty members, who engaged in a smear campaign accusing Setayesh of various wrongdoings, including academic freedom violations. Three faculty members sent correspondence to TBR, demanding that Setayesh be fired. A fellow administrator was verbally aggressive. In August 2017, Setayesh met with Sheryl Gossard, Director of Human Resources.

Setayesh requested guidance in filing a grievance against the employees she perceived to be harassing her. Setayesh provided Gossard with examples of the alleged harassment, which Gossard subsequently provided to Allen. Allen sought assistance from TBR, which advised him that Setayesh could not avail herself of the grievance process. TBR did not further investigate the claims to which Allen alerted them.

The following month, weary from the negativity surrounding her time as Vice President for Institutional Effectiveness, Setayesh submitted a request for transfer from her administrative position back to the faculty position of tenured professor. Allen recommended to TBR that, pursuant to NSCC and TBR policy, Setayesh be transferred at a salary rate of 90% of her administrative salary. Allen stated in his recommendation that Setayesh's performance had been "outstanding" and that nearly all of NSCC's "gains in student retention can be attributed to her data analysis and ensuing recommendations." (Docket No. 7-3.) Allen also noted that NSCC had "no force equal to hers in promoting student success" and that "[t]he changes she initiated will, unless undone, continue to have a positive impact on our student population." (*Id.*) A 2017 performance review of Setayesh's work corroborated Allen's praises, assessing her performance as "outstanding" and an "asset to the college." (Docket No. 7 at 8.) An October 2017 Memorandum of Record confirms that the last administrative employee who was converted to a faculty position was converted at an 83% salary rate.

Nonetheless, upon review of Setayesh's request and Allen's recommendation, TBR and Tydings—the TBR chancellor—denied Setayesh's transfer at her requested salary rate. Counsel for Setayesh sent Tydings a letter, "informing [her] of the long standing policy of converting salary using the 80% rule." (*Id.* at 9.) In response, TBR and Tydings denied that the policy existed but assured Setayesh that she could return to a faculty position when "it was convenient"

5

for Setayesh. (*Id*. at 10.) On January 2, 2018, McCormick was promoted to Interim President of NSCC from her previous role of Vice Chancellor of Public Affairs. Setayesh pleads that, as of that date, she was effectively removed from her position, "in that her authority was removed and [her] subordinates no longer reported to her." (*Id*.) The following week, McCormick met with Setayesh and informed her that "she was aware of [the] Agreement, but did not care what it said, and that she intended to ignore it." (*Id*.) On February 18, 2018, Setayesh was transferred to a faculty position at a salary of $3,869.42 per month, roughly half what she expected to make and significantly less than 80% of the $10,929.39 per month she was making as Vice President for Institutional Effectiveness. Upon inquiring about the discrepancy, Setayesh was told that "there is nothing further to explain." (*Id*.) Setayesh was not given thirty days' notice of her transfer. McCormick then assigned Setayesh to a teaching schedule that required Setayesh to work two nights per week at a campus across town. Setayesh describes the arrangement as "unfavorable, difficult, and undesirable" and notes that three part-time faculty members were removed from their classes in order to schedule her for these classes. In addition, Setayesh was prohibited from using any of her accrued annual leave before transferring back to her faculty position, despite having already scheduled a vacation.

Setayesh filed suit on April 3, 2018.[2] She brings claims under 42 U.S.C. § 1983 for violations of her First and Fourteenth amendment rights, by retaliation for speech on matters of public concern, and for violations of her Fifth and Fourteenth Amendment rights, by takings without due process. She also brings state law claims for breach of contract against NSCC, inducement to breach of contract against McCormick, and violations of Tennessee statutory employee protections against all defendants.

---

[2] Setayesh filed her Amended Complaint on April 10, 2018.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) governs dismissal of lawsuits for lack of subject matter jurisdiction. "Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co*., 491 F.3d 320, 330 (6th Cir. 2007). Here, the defendants challenge the court's subject matter jurisdiction in a facial attack, meaning that the defendant "challenge[s] the sufficiency of the pleading itself," *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "When reviewing a facial attack, a district court takes the allegations in the complaint as true." *Gentek*, 491 F.3d at 330.

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

## **ANALYSIS**

1. Eleventh Amendment Immunity

The defendants argue that the State and, as arms of the state, TBR, NSCC, and McCormick and Tydings (in their official capacities) are immune from suit. "[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003). The Eleventh Amendment states:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens of Subjects of a Foreign State.

U.S. Const. Amend. XI. As the Sixth Circuit succinctly stated in *Thiokol Corp. v. Dep't. of Treasury, State of Mich. Revenue Div.*, 987 F.2d 376 (6th Cir. 1993), "This immunity is far reaching. It bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens." 987 F.2d at 381 (internal citations omitted); *e.g. Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *Pennhurst State Schs. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). For the purposes of the instant lawsuit, the immunity provided to a state by the Eleventh Amendment is abrogated in only two circumstances: 1) where the state has itself waived its

immunity from federal suit; and 2) where Congress has acted to abrogate the state's immunity. *See Alden v. Maine*, 527 U.S. 706 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996).

While Congress may abrogate states' Eleventh Amendment immunity, the Supreme Court has held that it has not done so for § 1983 suits. *Quern v. Jordan*, 440 U.S. 332, 341 (1979) ("[W]e simply are unwilling to believe, on the basis of such slender 'evidence,' that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."). Moreover, neither states nor state officials are "persons" under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.") Thus, Tydings and McCormick are immune if TBR and NSCC, as arms of the state, are also immune.

This court has previously held that TBR is an arm of the state for Eleventh Amendment purposes, *Kompara v. Bd. of Regents of the State Univ. & Cmty. Coll. Sys. of Tenn.,* 548 F. Supp. 537, 542 (M.D. Tenn. 1982) (Wiseman, J.); *Boyd v. Tenn. State Univ.*, 848 F. Supp. 111, 114 (M.D. Tenn. 1994) (Wiseman, J.), as has the Sixth Circuit in an unpublished opinion, *Dotson v. State Tech. Inst. of Memphis*, 1997 WL 777947 (6th Cir. 1997). While it does not appear that any court has made an immunity determination with regard to NSCC, the Sixth Circuit, this court, and other district courts have all held that other Tennessee universities and community colleges are "arms of the state." *See id*. (State Technical Institute of Memphis); *Henderson v. Sw. Tenn. Cmty. Coll.*, 282 F. Supp. 2d 804, 807 (W.D. Tenn. 2003) (Southwest Tennessee Community College[3]); *Kompara*, 548 F. Supp. at 537, 542 (East Tennessee State University); *Boyd*, 848 F. Supp. at 113–14 (Tennessee State University). These institutions are all part of the same state university and community college system created by Tennessee statute. *See* Tenn.

---

[3] State Technical Institute of Memphis is a predecessor institution of Southwest Tennessee Community College.

Code Ann. § 49-8-101. NSCC is part of this system as well. *Id.* The court thus finds that the State of Tennessee, TBR, NSCC, and Tydings and McCormick (in their official capacities) are all entitled to immunity under the Eleventh Amendment.

2. Qualified Immunity

The defendants argue that McCormick and Tydings are shielded from individual liability for Setayesh's constitutional claims by the doctrine of qualified immunity. Qualified immunity protects state officials from suit when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012). Thus, a two-part test determines whether McCormick and Tydings are entitled to qualified immunity: (1) whether the facts, viewed in the light most favorable to Setayesh, show a violation of a constitutional right; and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011). The court will address Setayesh's constitutional claims in turn.

a. First Amendment Retaliation

The defendants argue that McCormick and Tydings are entitled to qualified immunity on Setayesh's First Amendment claim because Setayesh fails to establish that a constitutional violation occurred. A cause of action for First Amendment retaliation requires an employee to demonstrate that: "(1) [he] engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Mills v. Williams*, 276 F. App'x. 417, 418 (6th Cir. 2008) (citing *Scarbrough v. Morgan Cnty.*

*Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). Public employees such as Setayesh generally have "no right to object to conditions placed upon the terms of employment—including those which restrict[ ] the exercise of constitutional rights," but "[t]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 143 (1983)); *accord Keeling v. Coffee Cnty.*, 541 F. App'x. 522, 526 (6th Cir. 2013). Accordingly, the Sixth Circuit has held that a public employee's speech is constitutionally protected if (1) in making the speech, the employee was speaking as a citizen, and not as a public employee acting in furtherance of his ordinary responsibilities; and (2) the speech was on a matter of public concern. *See Boulton v. Swanson*, 795 F. 3d 526, 531–32, 534 (6th Cir. 2015). A public employee has "no First Amendment cause of action based on his . . . employer's reaction" to speech that was not made as a private citizen on a matter of public concern and is, therefore, not constitutionally protected. *Garcetti*, 547 U.S. at 418. The question of whether a public employee engaged in constitutionally protected speech is a question of law that is determined by the court. *Mayhew v. Town of Smyrna,* 856 F.3d 456, 464 (6th Cir. 2017). The court now looks to whether any of Setayesh's speech underlying this action can support her First Amendment claim, as a matter of law.

Setayesh argues that she spoke as a private citizen on a matter of public concern when she voiced concerns about policies and practices at NSCC. The defendants do not contest that Setayesh spoke on an issue of public concern. Their sole contention is that Setayesh did not speak as a private citizen, but rather as a public official. The standard for determining when a public employee's speech is exempted from First Amendment protection was initially explained by the Supreme Court a decade ago in *Garcetti*, which held that a public employee does not

speak as a citizen when his speech "owes its existence to the public employee's professional responsibilities." 547 U.S. at 421–22. After *Garcetti*, many courts read this exception to First Amendment protection broadly, to the point that a public employee's speech could be left unprotected, even when there was no real relationship between the employee's speech and his actual job duties. *See Boulton*, 795 F.3d at 533 (reversing a district court that read *Garcetti* too broadly). The Supreme Court addressed the breadth of the *Garcetti* exception in *Lane v. Franks*, 134 S. Ct. 2369 (2014), where it expressly rejected an overly expansive reading. The Court reasoned that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," and a "critical question" was "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id*. at 2379. "After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made *in furtherance of the ordinary responsibilities of his employment*." *Boulton*, 795 F.3d 526, 534 (6th Cir. 2015) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006)) (emphasis added). The determination before the court is thus whether Setayesh's Amended Complaint sets forth facts showing that her alleged protected speech was not in furtherance of her ordinary responsibilities as Vice President for Institutional Effectiveness.

Setayesh characterizes her various instances of allegedly protected speech as her "voicing concerns outside of her official job duties about policies or practices." (Docket No. 7 at 5.) But whether her speech was outside of her *official* job duties is not dispositive as to whether she was speaking as a public official. As the *Garcetti* court noted:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is

12

>within the scope of the employee's professional duties for First
>Amendment purposes.

*Garcetti*, 547 U.S. at 424–25. The relevant inquiry is whether her speech was outside the scope of the duties she ordinarily performed in an administrative capacity.

Setayesh pleads that her "duties as Vice President of Institutional Effectiveness mainly included: (i) overseeing human resources, creative services, and institutional research; and (ii) monitoring resource allocations." (Docket No. 7 at 4.) She offers no further detail to these broad categorizations. Allen's letter indicates that data analysis and recommendations regarding student retention fell under Setayesh's purview and that Setayesh was responsible for general promotion of student success. (Docket No. 7-3.) The Sixth Circuit has provided guidance on defining an employee's duties in such cases:

>Determining whether an employee speaks as a private citizen or as a public employee can be challenging. The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Instead, the "proper inquiry is a practical one." To aid in the assessment of a public employee's statement, "we must consider both its content and context." In our pre-*Lane* case law, we recognized several non-exhaustive factors to consider, including: the speech's impetus; its setting; its audience; and its general subject matter. We have continued to utilize these "who, where, what, when, why, and how" considerations post-*Lane*, which inform the answer to *Lane's* "critical question": "whether the speech at issue is itself ordinarily within the scope of an employee's duties."

*Mayhew*, 856 F.3d at 464. (internal citations omitted). Some of these factors militate against Setayesh having spoken as a private citizen. For example, she pleads that she "was a vocal proponent within the Office of Effectiveness and Strategic Initiatives and the broader College on issues relating to the proper functioning of the College." (*Id*. at 5.) That Setayesh confined her speech to her office and the NSCC undercuts her argument that she spoke as a private citizen.

*See Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (finding that an employee spoke as a public official when he wrote an internal memo to his supervisor); *Garcetti*, 547 U.S. at 421 (same). But these considerations are outweighed by the subject matter of her speech.

The court notes that some of Setayesh's instances of allegedly protected speech could plausibly fall within her job duties of overseeing human resources, creative services, and institutional research, or monitoring resource allocations. But the court must at this stage construe the facts in the light most favorable to Setayesh. And, viewing the facts in the light most favorable to Setayesh, the subject matter of her speech supports her claim that she spoke as a private citizen. The content of at least some of her allegations clearly falls outside of her ordinary job duties, even as broadly defined. For example, the discovery that NSCC was offering certain online courses without review by the appropriate committee does not fit within any of the duties described by Setayesh. The discovery that some faculty members' courses contained copyright violations is related to a duty of monitoring resource allocations only to the extent that all functionary duties are reducible at some base level to financial considerations. And concerns about a lack of oversight in academic affairs is not a "human resources" issue, as that term is commonly understood. "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee [ ] speech." *Lane*, 134 S.Ct. at 2379. This is for good reason: "speech by public employees on subject matter related to their employment hold special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id*. Setayesh's speech was related to the proper functioning of the college beyond the areas over which she had responsibility. *Lane* instructs that this is precisely the type of speech that gives rise to a First Amendment retaliation claim. *Id*. at 2380. Setayesh sufficiently pleads that at least some of her

speech, while based on information obtained through her employment, was not made in furtherance of her ordinary duties at NSCC. Her First Amendment claim will not be dismissed at this stage.

        b. Due Process

Construing the Amended Complaint in the light most favorable to Setayesh, she alleges three violations of procedural due process. First, she alleges that the defendants violated the terms of the Agreement without due process, "especially in causing a tangible monetary loss of salary and benefits" by, amongst other actions, denying her requested salary conversion rate. (Docket No. 7 at 16.) Second, she alleges that TBR and NSCC eliminated her appointment without thirty days' notice, preventing her from using accrued annual leave. Third, she alleges that TBR and NSCC denied her access to an internal grievance process, which she sought to use to file formal complaints against co-workers who allegedly harassed her in response to her protected speech. The second and third allegations—that Setayesh was transferred back to a faculty position without notice and denied access to an internal grievance procedure—are not made against Tydings or McCormick and will therefore not be considered. The first allegation, however, implicates Tydings. *See id*. at 13 ("[T]he unconstitutional decision to deny [Setayesh]'s salary request in transferring back to a faculty position, contravening her Agreement and prior long standing institutional practice as made by [Tydings], a final policy maker at the TBR.").

The Sixth Circuit has held that procedural due process liability arises where there is a property right that triggers due process protections. *See Braun v. Ann Arbor Charter Tp.*, 519 F.3d 564, 573 (6th Cir. 2008) ("In order to have a property interest in a benefit, a person must have more than a desire for it or unilateral expectation of it; rather, he must have a legitimate

claim or entitlement to it"). Setayesh sufficiently pleads such an interest in the salary she was denied when Tydings rejected her transfer at a salary rate commensurate with the 80% rule allegedly incorporated into the Agreement. However, deprivation of property without due process is not actionable under § 1983 when the property interest in question is merely a quantifiable sum of money. *See Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1274 (6th Cir. 1988) (collecting cases). In *Ramsey*, the Sixth Circuit held that an employee could not bring a procedural due process claim under § 1983 based on a reduction of accumulated sick leave days. The court explained:

> [A]n employee deprived of a property interest in a specific benefit, term, or condition of employment, suffers a loss which is defined easily . . . and therefore, any interference with that interest is redressed adequately in a state breach of contract action.

*Id*. The employee's loss was easily quantifiable: "Ramsey has lost 113 (her eliminated days) times the amount of compensation per day the Board will give her when she retires." *Id*. The Sixth Circuit held that § 1983 was therefore not an appropriate vehicle for redress. *Id*. Setayesh's due process claim against Tydings—violation of the Agreement, "especially in causing a tangible monetary loss of salary and benefits"—seeks redress for a loss comparable to that in *Ramsey*. (Docket No. 7 at 16.) What Setayesh is allegedly due under the 80% rule is easily quantifiable and, thus, could be addressed via a state breach of contract claim if she sought no additional damages.

But in addition to her monetary injuries, Setayesh pleads that she also suffered humiliation, embarrassment, emotional distress, and damage to her reputation. "[M]ental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983." *Contract Design Grp., Inc. v. Wayne State Univ.*, 635 F. App'x 222, 233 (6th Cir. 2015). And, unlike Setayesh's monetary injuries, damages for her mental and emotional distress

16

are not ascertainable via rote calculation and are not recoverable via a state breach of contract action. *Kindred v. Nat'l Coll. of Bus. & Tech., Inc.*, No. W2014-00413-COA-R3CV, 2015 WL 1296076, at *11 (Tenn. Ct. App. Mar. 19, 2015) ("In Tennessee, the general rule is that there can be no recovery of damages for mental anguish occasioned by a breach of contract."). Thus, *Ramsey* does not preclude Setayesh's claim, and it will not be dismissed at this stage.

Setayesh also brings a claim for violation of her substantive due process rights:

> Additionally, due process requires written rules and written standards. Due process requires that rules enforced must actually exist. Nowhere in the policies and requirements of the TBR or [NSCC] is the policy stated which was used to reduce [Setayesh]'s salary below what was contracted for in her Agreement. This policy was imposed in an arbitrary and capricious manner, a substantive due process violation.

(Docket No. 7 at 17.) Construing this charge broadly, the court reads Setayesh's claim as alleging that Tydings violated her substantive due process rights by arbitrarily rejecting her requested salary conversion in contravention of the Agreement. In other words, because TBR and NSCC did not have a specific written policy in place for determining when the 80% rule would not apply, Tydings acted in an arbitrary and capricious manner by rejecting Setayesh's proposed salary conversion rate. In response, the defendants argue only that Tydings is entitled to qualified immunity because Setayesh suffered no clear violation of constitutional rights from the lack of written rules and standards for determining when recommended salary conversion rates do not apply. But the defendants misunderstand Setayesh's argument. Setayesh "does not merely allege an arbitrary application of procedures, or lack thereof, but that this act was one of many used in furtherance of the violation of [Setayesh]'s First Amendment rights." (Docket No. 13-1 at 20.) Thus, the relevant inquiry is not, as the defendants argue, whether Setayesh had a right to have written procedures and standards applied to her contract dispute. It is whether

17

Tydings, by acting arbitrarily, violated clearly-established First Amendment rights. Setayesh argues that she had clear rights to freedom of expression that Tydings violated by denying her requested salary conversion as punishment for protected speech. Indeed, First Amendment violations can give rise to a substantive due process claim. *See Perry v McGinnis*, 209 F.3d 597, 609 (6th Cir. 2000). Thus, Setayesh sufficiently pleads that Tydings violated her clearly-established rights by arbitrarily ignoring the Agreement as retaliation for protected speech. Tydings is not entitled to qualified immunity on this claim.

    3. Statutory Immunity

The defendants argue that McCormick and Tydings are statutorily immune from liability for Setayesh's state law claims against them. In support, McCormick and Tydings cite T.C.A. § 9-8-307, which reads in pertinent part as follows:

> (h) State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or employee's office or employment, *except for willful, malicious, or criminal acts* or omissions or for acts or omissions done for personal gain.

Tenn. Code Ann. § 9-8-307(h) (emphasis added). For all of her state law claims, Setayesh pleads willful or malicious conduct on behalf of the individual defendants. With regard to the inducement to breach of contract claim against McCormick, Setayesh pleads knowingly and intentionally ignored the Agreement in transferring her at a salary not commensurate with her expected salary under the 80% rule. With regard to the claim for violation of Tennessee state employment protections, Setayesh pleads that Tydings and McCormick knowingly and willfully took adverse actions against her by transferring and otherwise discriminating against her regarding the compensation, terms, location, and privileges of her employment in response to

constitutionally-protected activity. Tydings and McCormick, therefore, cannot avail themselves of statutory immunity.

## **CONCLUSION**

For the foregoing reasons, the defendants' Motion to Dismiss will be granted in part in a separate order.

_____
ALETA A. TRAUGER
United States District Judge